**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
          jsmith@bursor.com

**BURSOR & FISHER, P.A.**
Alec M. Leslie (*pro hac vice*)
888 7th Avenue
New York, NY  10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: aleslie@bursor.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FELIX OBERTMAN, individually and on behalf of all others similarly situated, | Case No. 2:19-cv-02487-KJM-AC |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |
| v. | |
| ELECTROLUX HOME PRODUCTS, INC., | Date:  October 8, 2021 |
| Defendant. | Time:  10:00 a.m. |
| | Courtroom:  3, 15th Floor |
| | Judge:  Hon. Kimberly J. Mueller |

**REDACTED VERSION PURSUANT TO SEPTEMBER 14, 2020
STIPULATED PROTECTIVE ORDER FOR STANDARD LITIGATION**

## TABLE OF CONTENTS

PAGE(S)

I.      INTRODUCTION ..................................................................................................... 1

II.     SUMMARY OF COMMON EVIDENCE ............................................................... 2

        A.      There Is Common Evidence Of The F0 Defect ............................................. 2

        B.      There Is Common Evidence Frigidaire Knew About The Defect .......................... 5

        C.      Class Damages Can Be Measured With Common Evidence ..................................... 8

III.    ARGUMENT .......................................................................................................... 9

        A.      The Requirements Of Rule 23(a) Are Satisfied ......................................... 9

                1.      Numerosity ........................................................................ 9

                2.      Commonality ..................................................................... 10

                3.      Typicality ......................................................................... 11

                4.      Adequacy ......................................................................... 11

                        a.      Plaintiff Is An Adequate Representative ......................... 11

                        b.      Plaintiff's Counsel Is Adequate ..................................... 12

        B.      Common Questions Of Law Or Fact Predominate ..................................... 12

                1.      Claims Under the CLRA and UCL Fraud Prong ............................ 13

                2.      The Implied Warranty Claim ......................................................... 14

                3.      The Unjust Enrichment Claim ....................................................... 16

        C.      Other Certification Requirements Are Satisfied ....................................... 17

                1.      Class Litigation Is Superior To Other Methods Of
                        Adjudication ..................................................................... 17

                2.      Plaintiff Presents A Viable Damages Model ................................. 17

                3.      Ascertainability Is No Longer Required, But ................................ 18

IV.     CONCLUSION ..................................................................................................... 19

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Abdullah v. U.S. Sec. Assocs., Inc.*,
  731 F.3d 952 (9th Cir. 2013) ................................................................. 9

*Aldapa v. Fowler Packing Co., Inc.*,
  323 F.R.D. 316 (E.D. Cal. 2018) ........................................................... 11

*Alger v. FCA US, LLC*,
  334 F.R.D. 415 (E.D. Cal. 2020) ........................................................... 10

*Baker v. Microsoft Corp.*,
  797 F. 3d 607 (9th Cir. 2015) ............................................................... 13

*Bradach v. Pharmavite, LLC*,
  735 F. App'x 251 (9th Cir. 2018) .......................................................... 13

*Burton v. Gerber Prod. Co.*,
  703 F. App'x 468 (9th Cir. 2017) .......................................................... 18

*California State Elecs. Assn v. Zeos Internat, Ltd.*,
  41 Cal. App. 4th 1270 (1996) ............................................................... 16

*Cartwright v. Viking Indus., Inc.*,
  2009 WL 2982887 (E.D. Cal. Sept. 14, 2009) ...................................... 16

*Corson v. Toyota Motor Sales, U.S.A., Inc.*,
  2013 WL 10068136 (C.D. Cal. July 18, 2013) ...................................... 14

*Cruz v. MM 879, Inc.*,
  329 F.R.D. 639 (E.D. Cal. 2019) ........................................................... 11

*Daniel v. Ford Motor Co.*,
  806 F.3d 1217 (9th Cir. 2015) .............................................................. 14

*Edwards v. Ford Motor Co.*,
  603 Fed. Appx. 538 (9th Cir. 2015) ...................................................... 13

*Evans v. IAC/Interactive Corp.*,
  244 F.R.D. 568 (C.D. Cal. 2007) ........................................................... 11

*Famular v. Whirpool Corp.*,
  2019 WL 1254882 (S.D.N.Y. Mar. 19, 2019) ....................................... 12

*Galvan v. KDI Distrib. Inc.*,
  2011 WL 5116585 (C.D. Cal. Oct. 25, 2011) .................................. 11, 18

*Guido v. L'Oreal, USA, Inc.*,
   2014 WL 6603730 (C.D. Cal. 2014) ................................................................ 8, 18

*Guinn v. Sugar Transp. Of the Nw., Inc.*,
   2017 WL 6513306 (E.D. Cal. Dec. 20, 2017) ........................................................ 12

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ............................................................. 10, 11, 12

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ........................................................................... 11

*In re Arris Cable Modem Consumer Litig.*,
   327 F.R.D. 334 (N.D. Cal. Aug. 10, 2018) ........................................... 9, 10, 14, 18

*In re ConAgra Foods, Inc.*,
   90 F. Supp. 3d 919 (C.D. Cal. 2015) .................................................................. 14

*In re Lenovo Adware Litig.*,
   2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) ....................................................... 18

*In re Scotts EZ Seed Litig.*,
   304 F.R.D. 397 (S.D.N.Y. 2015) ......................................................................... 9

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   267 F.R.D. 583 (N.D. Cal. 2010) ........................................................................ 9

*Jacobo v. Ross Stores, Inc.*,
   2017 WL 9486150 (C.D. Cal. May 1, 2017) ........................................................ 19

*Just Film, Inc. v. Buono*,
   847 F.3d 1108 (9th Cir. 2017) ........................................................................... 17

*Kaupelis v. Harbor Freight Tools USA, Inc.*,
   2020 WL 5901116 (C.D. Cal. Sept. 23, 2020) ............................................... passim

*Kayes v. Pac. Lumber Co.*,
   51 F.3d 1449 (9th Cir. 1995) ............................................................................ 11

*Keegan v. American Honda Motor Co.*,
   838 F. Supp. 2d 929 (C.D. Cal. 2012) ................................................................ 14

*Khoday v. Symantec Corp.*,
   93 F. Supp. 3d 1067 (D. Minn. 2015) ................................................................... 9

*Martinelli v. Johnson & Johnson*,
   2019 WL 1429653 (E.D. Cal. Mar. 29, 2019) ...................................................... 18

*McCann v. Foster Wheeler LLC*,
   48 Cal. 4th 68 (2010) ..................................................................................... 15

*Melgar v. Zicam, LLC,*
　　2014 WL 5486676 (E.D. Cal. Oct. 29, 2014) ......................................... 12

*Nguyen v. Nissan N. Am., Inc.,*
　　932 F.3d 811 (9th Cir. 2019) ................................................................ 13

*Odyssey Wireless, Inc. v. Apple, Inc.,*
　　2016 WL 7644790 (S.D. Cal. Sept. 14, 2016) ...................................... 18

*Orozco v. Illinois Tool Works, Inc.,*
　　2017 WL 1356020 (E.D. Cal. Feb. 17, 2017) ....................................... 10

*Otto v. Abbott Lab'ys Inc.,*
　　2015 WL 9698992 (C.D. Cal. Sept. 29, 2015) ...................................... 19

*Phillips Petroleum Co. v. Shutts,*
　　472 U.S. 797 (1985) .............................................................................. 15

*Pulaksi & Middleman, LLC v. Google, Inc.,*
　　802 F.3d 979 (9th Cir. 2015) ................................................................ 18

*Rannis v. Recchia,*
　　380 Fed. App'x 646 (9th Cir. 2010) ..................................................... 10

*Salas v. Toyota Motor Sales, U.S.A., Inc.,*
　　2019 WL 1940619 (C.D. Cal. Mar. 27, 2019) ................................ 14, 16

*Sanchez-Knuton v. Ford Motor Co.,*
　　310 F.R.D. 529 (S.D. Fla. 2015) ............................................................. 9

*Schmitt v. Younique, LLC,*
　　2019 WL 1431906 (C.D. Cal. Jan. 10, 2019) ...................... 11, 12, 13, 17

*Schwartz v. Upper Deck Co.,*
　　183 F.R.D. 672 (S.D. Cal. 1999) .......................................................... 10

*Tait v. BSH Home Appliances Corp.,*
　　289 F.R.D. 466 (C.D. Cal. 2012) ..................................................... 13, 14

*True Health Chiropractic, Inc. v. McKesson Corp.,*
　　896 F.3d 923 (9th Cir. 2018) ........................................................... 13, 18

*United States ex rel. Terry v. Wasatch Advantage Grp., LLC,*
　　327 F.R.D. 395 (E.D. Cal. 2018) ................................................ 9, 11, 12

*Wal-Mart Stores, Inc. v. Dukes,*
　　564 U.S. 338 (2011) .............................................................................. 10

*Wolin v. Jaguar Land Rover N. Am., LLC,*
　　617 F.3d 1168 (9th Cir. 2010) ................................................... 10, 13, 17

**STATUTES**

Cal. Bus. & Prof. Code § 17203 .................................................................................. 18

Cal. Civ. Code § 1780 ................................................................................................ 18

Cal. Civ. Code § 1791.1 ...................................................................................... 14, 18

Cal. Civ. Code § 1794(b)(2) ...................................................................................... 18

Colo. Rev. Stat. § 4-2-725 ......................................................................................... 15

**RULES**

Fed. R. Civ. P. 23 ............................................................................................. passim

**OTHER AUTHORITIES**

U.C.C. § 2-314................................................................................................. 15

1

## I.      INTRODUCTION

2      This case is straight forward:  Defendant Electrolux Home Products Inc. ("Electrolux" or

3    "Defendant") sold certain Frigidaire dehumidifiers bearing model numbers FFAD3033R1,

4    FFAD5033R1, FFAD7033R1 (the "Dehumidifiers"), all of which suffered from an identical design

5    defect.  Namely, the Dehumidifiers leak refrigerant due to the use of dissimilar metals, which causes

6    accelerated corrosion and ultimately product failure.  When the product fails, it displays the "F0"

7    Error Code (the "F0 Defect").

8      Electrolux has known about the F0 Defect since at least 2015 from multiple sources,

9    including consumer complaints posted on its website, calls made to its Customer Engagement Center,

10   a "quality project" Electrolux launched in 2017 to determine the cause of the F0 Defect, a database

11   it maintained containing complaints from over 21,000 consumers frustrated with the F0 Defect, a

12   2019 investigation undertaken by Electrolux regarding the F0 Defect, and subsequent employee

13   emails describing the F0 Defect.

14     Three common questions of law or fact will drive resolution of this litigation: (1) whether the

15   Dehumidifiers were suitable for their ordinary purpose or of "generally acceptable" quality; (2)

16   whether a reasonable consumer would consider the F0 Defect material; and (3) whether Electrolux

17   knew about the F0 Defect when it sold the Dehumidifiers.  Electrolux will do its best to focus the

18   Court's attention on purported individualized issues, but these common questions are at the core of

19   this case.  Accordingly, Plaintiff seeks certification of the following classes:

20
21
22
23
24
25

> **Multi-State Implied Warranty Class**: All persons who purchased an
> Electrolux Dehumidifier bearing model number FFAD3033R1,
> FFAD5033R1, or FFAD7033R1 for personal, family or household
> use: (1) in Alaska, Arkansas, California, Colorado, D.C., Hawaii,
> Indiana, Maine, Maryland, Massachusetts, Minnesota, Mississippi,
> Nebraska, New Hampshire, New Jersey, New Mexico, North Dakota,
> Oklahoma, Pennsylvania, South Dakota, Virginia, West Virginia, and
> Wyoming who purchased from December 12, 2015 through the
> present; or (2) in Colorado who purchased from December 12, 2016
> through the present.

26
27

> **California Class:**   All persons in California who purchased an
> Electrolux Dehumidifier bearing model number FFAD3033R1,

28

> FFAD5033R1, or FFAD7033R1 for personal, family, or household use from December 12, 2015 through the present.

Excluded from each proposed class are persons who already received a refund from Electrolux or a retailer.

Plaintiff's proposed classes are virtually identical to those classes recently certified in *Kaupelis v. Harbor Freight Tools USA, Inc.*, 2020 WL 5901116, *15 (C.D. Cal. Sept. 23, 2020) ("the Court: GRANTS the motion for class certification as to Plaintiffs' proposed California and Multi-State Implied Warranty Classes."). As in *Kaupelis*, the products here suffer from a single defect that manifests across multiple models. *See id.* at *7 ("Although YAT and SUMEC chainsaws contained different models of trigger, each was a single pole internal switch."). As in *Kaupelis*, the evidence demonstrates that Electrolux was aware of the defect and of its propensity to shorten the lifespan of the products. *Id.* ("Moreover, the evidence presented . . . shows that HFT did believe that the SUMEC chainsaws and the YAT chainsaws were susceptible to the same failures because of the single pole internal switch"). And, as in *Kaupelis*, Plaintiff proposes to measure damages by utilizing the same conjoint analysis methodology devised by Steven P. Gaskin and Colin B. Weir. *Id.* at *6 ("conjoint analysis is a methodologically plausible way of calculating damages").

For these and the reasons discussed below, Plaintiff respectfully asks this Court to certify his proposed classes, appoint him as class representative, and appoint Bursor & Fisher, P.A. as class counsel.

## II.    SUMMARY OF COMMON EVIDENCE

### A.    There Is Common Evidence Of The F0 Defect

Plaintiff purchased a Frigidaire dehumidifier bearing model number FFAD7033R1 from a Best Buy in the summer of 2017. Obertman Decl. ¶ 4; *see also* First Amended Complaint ("FAC") ¶ 3 (ECF No. 12). After approximately one year of normal, household use, Plaintiff's dehumidifier displayed the F0 Error Code. *See* Obertman Decl. ¶ 5; FAC ¶ 4. Plaintiff attempted to solve the problem by unplugging and resetting the unit and by resetting his circuit breaker. Obertman Decl. ¶ 5. But those efforts did not resolve the F0 Error Code. Plaintiff ultimately threw the dehumidifier in the trash because it was no longer functioning. Obertman Decl. ¶ 5.

Plaintiff was not alone in experiencing the F0 Defect.  In fact, Electrolux received complaints from **21,301** people in connection with the F0 Defect.  Ex. 1 at 24[1]; *see also* Ex. 2 at 7.  That number does not include purchasers who complained directly to retailers such as Best Buy, Amazon, Home Depot, Kohl's and Walmart.  Ex. 1 at 25.

Gree Electric Appliances Inc. of Zhuhai ("Gree") first developed the Dehumidifiers in 2014 or 2015.[2]  Ex. 1 at 8-10.  Without any serious testing, Electrolux purchased the Dehumidifiers from Gree and began selling them in the United States.  Ex 1 at 11, 16-18.  Problems with the Dehumidifiers began almost immediately.

Following numerous complaints from consumers, Electrolux began a "quality project" to investigate the problems with the Dehumidifiers in 2017.  *See* Ex. 1 at 30, 32, 26, 41.  As a part of the "quality project," Martin Besant, Electrolux's Senior Products and Safety Engineer and Rule 30(b)(6) Witness, tested five Dehumidifiers that had been returned as "faulty."  Ex. 1 at 43-44.  "Using a leak detection device," Mr. Besant *"determined that . . . there were [refrigerant] leaks in [all five of] the samples."*  Ex. 1 at 44 (emphasis added).

Subsequently, on August 16, 2017, Mr. Besant emailed an engineer on Electrolux's Product Development Team, requesting "a logic diagram explaining . . . the F0 code."  Ex. 1 at 30-32.  Electrolux's engineers explained that *"after [a] certain number of cycles, when [the evaporator coil] reaches a minimum temperature, [the dehumidifier] displays the F0 code."*  Ex. 1 at 33-34 (emphasis added).  They also explained that *"[i]f there's approximately a 60 percent leakage of refrigerant, the dehumidifier occurs F0."*  Ex. 1 at 46 (emphasis added).  In response, Mr. Besant stated that he was studying "quality issues [with the Dehumidifiers], including the [high] rate of returns."  Ex. 1 at 36.  By "rate of returns," Mr. Besant later explained that he was referring to "the

---

[1] All exhibits cited in this brief are attached to the concurrently filed Declaration of L. Timothy Fisher.

[2] The Dehumidifiers are the same aside from immaterial specifications such as the size of the units and the corresponding size of their compressors.  Ex. 1 at 4-6.  Indeed, each model was designed and manufactured by Gree; each model employs the same evaporator coils made of copper tubing with aluminum fins; each model uses a metal and steel endplate; each model has a life span of seven to nine years; each model was subject to the same F0 Defect stemming from refrigerant leak; each model was subject to a single "logic diagram explaining how the F0 Code . . . work[s];" and significantly, each model was subject to the same solutions for addressing the cause of the F0 Defect.  *See id.* at 7, 9, 31-32, 42, 45, 46, 52-56.

rate of returns reported in [Electrolux's Customer Engagement Center] . . . call database." Ex. 1 at 36. Despite identifying the potential source of the problem, Electrolux did not pull the Dehumidifiers from store shelves, issue a recall, or make any changes to the product. Ex. 1 at 21-22, 25, 47, 57.

Unsurprisingly, the problems with the Dehumidifiers did not disappear in 2017. ██████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ *See* Ex. 3. In 2019, Mr. Besant wrote about the Dehumidifiers that "[a] major complaint of consumers on social media and to the Call Center is ***the failure of the unit within the first year of use*.**" Ex. 4 at 1-2 (emphasis added); *see also* Ex. 5 at 1-2 (showing the number of consumer complaints regarding the Dehumidifiers was almost four times that of a similar model made by a different manufacturer).

On September 9, 2019, Mr. Besant received an email from Gree showing the location of the refrigerant leaks that plagued the Dehumidifiers. Ex. 6 at 1-2. The photograph demonstrated the areas prone to leakage:



Gree reported to Electrolux that "[o]ur QC found the leak location, it's mainly located at the red circle area, where the steel plate contact [sic] with the copper tube." Ex. 6 at 1.

Gree's determination is consistent with the analysis performed by Plaintiff's engineering expert, Dr. John M. Tobias,[3] submitted herewith. *See* Ex. 12 at 5-7. ██████████████████

---

[3] Dr. Tobias is a highly-qualified engineer specializing in electrical engineering. In addition to his Ph.D. in Electrical Engineering from the New Jersey Institute of Technology, Dr. Tobias has over 29 years of experience in the design and inspection of electrical equipment, devices, and installations



Despite its thorough understanding of the F0 Defect as well as its knowledge of proposed solutions, Electrolux again did nothing. It did not issue a recall, remove the Dehumidifiers from store shelves, or ask Gree to implement the solutions it proposed. Ex. 1 at 21-22, 25, 47, 57.

**B.     There Is Common Evidence Frigidaire Knew About The Defect**

There can be no doubt Electrolux knew that its Dehumidifiers were defective. There are <u>at least five sources</u> from which Electrolux would have been put on notice regarding the existence of the Defect from as early as 2015.

<u>First</u>, numerous consumers reported the F0 Defect to Electrolux through Frigidaire's website, Frigidaire.com. Ex. 1 at 29. The complaints stem from as early as 2015 – the same year that Electrolux began selling the defective Dehumidifiers. *See* FAC ¶¶ 17-47; Ex. 1 at 20. Electrolux

and has investigated electrical mishaps and malfunctions that resulted in equipment failure, personal injury and fire. *See* Ex. 12 at 2, 11-12.

was also aware of complaints posted on the internet because Electrolux engages a company named BazaarVoice to perform "moderation of comments [on] Frigidaire.com" in light of "more and more interest . . . involved in the ratings of products." Ex. 1 at 29.  Electrolux also has employees monitoring and responding to reviews and complaints posted on its own website as well as other retailers' websites, and the complaints began in 2015.  *See, e.g.*, FAC ¶¶ 17-85.

Second, Electrolux learned of the F0 Defect through consumer complaints placed to its Customer Engagement Center ("CEC").  Ex. 1 at 2.  Electrolux's CEC fields and responds to consumer inquiries and complaints.  Ex. 1 at 2.  The CEC receives those inquiries and complaints in the form of telephone calls and emails.  Ex. 1 at 2.  Those calls and emails are then maintained in a central database.  Ex. 1 at 26-27.  Defendant's CEC database contains **21,301** complaints from consumers about the F0 Defect.  Ex. 1 at 27-28.  By the end of 2016, the first full year Electrolux sold the Dehumidifiers, Electrolux had already received roughly **850** complaints directly from consumers to its CEC.  *See* Fisher Decl., ¶ 15.

Given the volume of F0 Error Code complaints received early on from consumers, Mr. Besant also testified that "the issue [with the F0 Error Code] was first raised during our 2016 training session" for CEC employees.  Ex. 1 at 37.  He stated that "[t]he agents we were training mentioned that they had received some complaints about the F0 code and were inquiring about it."  Ex. 1 at 35.  Mr. Besant also stated that the CEC agents specifically "wanted to know what [the F0 Error Code] was and what they should do."  Ex. 1 at 39.  In response, Mr. Besant began looking into the matter more intently.  *Id.*  He stated that he "accessed the CEC calls and investigated the codes, [him]self."  Ex. 1 at 38.  Eventually, on May 18, 2018, Electrolux issued a "training bulletin for CEC call people outlining what to do if they received an F0 . . . error code."  Ex. 1 at 58.  The training bulletin was released with the intention "that the call center people were responding consistently to these error code[]" inquiries.  Ex. 1 at 58-59.

Third, Mr. Besant received an email in 2017 from a reverse logistics company called Big Apple Industries that had also been encountering consumers complaining about the F0 Defect.  Ex. 1 at 41-42.  As Mr. Besant testified, it was unusual for Big Apple Industries to reach out to him about "a specific error code."  Ex. 1 at 41-42.  As a part of its inquiry into the F0 Defect, Big Apple obtained

several Dehumidifiers that had been returned to Best Buy. Ex. 1 at 41-42. Big Apple Industries brought the issue to Electrolux's attention and wanted to know the reasons for the F0 Defect and how it could be repaired. Ex. 1 at 42-43.

Fourth, in response to the emails from Big Apple and the consumer complaints to the CEC, Mr. Besant launched a "quality project" in 2017 to study the underlying reasons for the F0 Defect. Ex. 1 at 30-31. Mr. Besant obtained five Dehumidifiers and performed leak tests on those units. Ex. 1 at 43-44. "Using a leak detection device," Mr. Besant immediately "determined that . . . there were [refrigerant] leaks in [all five of] the samples." Ex. 1 at 44.

Fifth, numerous emails to and from Electrolux employees show that Electrolux knew about the problems associated with the F0 Defect. For example, on August 6, 2019, Mr. Besant emailed Electrolux colleagues, stating that "[b]elow is a chart of the interval between the Purchase Date and the Call Date to the CEC for a leak code. *A major complaint of consumers on social media and to the Call Center is the failure of the unit within the first year of use*." Ex. 4 at 1-2 (emphasis added). Mr. Besant also stated that "[i]n the case of Gree it would seem they are not detecting leaks during manufacturing or there are issues with the design and shipping vibration." Ex. 4 at 1.

Mr. Besant's email also included the following chart:



1

2 Ex. 4 at 2.  This chart compares the number of calls regarding the F0 Error Code between the

3 Dehumidifiers at issue here and dehumidifiers manufactured by another company, Midea.  And the

4 calls displayed in the chart pertain specifically to "leak[s]" inherent to these Dehumidifiers.  *Id.*  The

5 chart is unequivocal: the Dehumidifiers were prone to failure within one to two years after purchase,

6 which stands in stark contrast to Mr. Besant's testimony that the useful life of these products should

7 be seven to nine years.  In fact, Mr. Besant emailed colleagues admitting that the Dehumidifiers

8 "***have a very high rate of first and second year failures.***"  Ex. 8.

9 In short, based on the above classwide evidence, a jury could reasonably conclude that, more

10 likely than not, Electrolux knew about the F0 Defect because it repeatedly heard the same complaints

11 about the same products since they were first sold in 2015.

12 **C.     Class Damages Can Be Measured With Common Evidence**

13 To calculate classwide damages, Plaintiff proposes a choice-based conjoint survey combined

14 with an economic analysis based on the results of the conjoint survey.  *See* Ex. 10 at 5-11; Ex. 11 at

15 9-13, 15.  This method "is designed to estimate the reduction in market value (measured in dollars

16 and/or percentage terms) due to the Defect, meaning the difference in the value of the Class Products

17 with the Defect compared to the value of the Class Products without the Defect at the time and point

18 of first purchase."  Ex. 10 at 4.  The conjoint study will measure only those damages attributable to

19 Plaintiff's theory concerning the F0 Defect.  *See Kaupelis v. Harbor Freight Tools USA, Inc.*, 2020

20 WL 5901116, at *6 (C.D. Cal. Sept. 23, 2020) (quoting *Guido v. L'Oreal, USA, Inc.*, 2014 WL

21 6603730, at *5 (C.D. Cal. 2014) ("Conjoint analysis 'has been used for decades as a way of

22 estimating the market's willingness to pay for various product features.'  As such, it is an apt method

23 for considering the market value of a product that is not actually on the market.").  Put more plainly,

24 the conjoint study shows how consumers value the Dehumidifiers with and without the F0 Defect.

25 *See* Ex. 10 at 4.

26 Plaintiff's experts Steven P. Gaskin and Colin B. Weir are well-qualified and experienced in

27 their fields.  The methodology they propose here is largely the same methodology they used

28 successfully in other product defect cases.  *See*, *e.g.*, *Kaupelis*, 2020 WL 5901116, at *6 (certifying

1   classes and denying Daubert motions to exclude Gaskin and Weir); *see also In re Arris Cable Modem*

2   *Consumer Litig.*, 327 F.R.D. 334, 366-75 (N.D. Cal. Aug. 10, 2018) (same).  Mr. Gaskin is an award-

3   winning published practitioner of conjoint analysis. Ex. 10, Gaskin Decl., at Ex. A; *see also Sanchez-*

4   *Knuton v. Ford Motor Co.*, 310 F.R.D. 529, 539 (S.D. Fla. 2015) (accepting Gaskin's "proposed

5   conjoint analysis damages model for purposes of class certification" to measure a product defect);

6   *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1082 (D. Minn. 2015) (finding "Gaskin's conjoint

7   analysis is generally a permissible method for calculating damages.").  Likewise, Colin B. Weir is a

8   well-qualified economic expert who has offered similar analyses in other consumer class actions and

9   who independently reviewed the design of Mr. Gaskin's conjoint survey.  Ex. 11 at 2-3; *see*, *e.g.*, *In*

10   *re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-15 (S.D.N.Y. 2015) (finding Weir's proposed conjoint-

11   based damages model satisfied *Comcast* because it would accurately measure the price premium).

## III.    ARGUMENT

13          This Court has held that "[t]o be eligible for certification, the proposed class must be precise,

14   objective, and presently ascertainable."  *United States ex rel. Terry v. Wasatch Advantage Grp., LLC*,

15   327 F.R.D. 395, 404 (E.D. Cal. 2018) (Mueller, J.) (internal quotations omitted).  "The proposed

16   class definition need not identify every potential class member from the very start."  *Id.*  Instead,

17   "[t]his requirement is a practical one.  It is meant to ensure the proposed class definition will allow

18   the court to efficiently and objectively ascertain whether a particular person is a class member."  *Id.*

19   (citing *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 592 (N.D. Cal. 2010)).  On

20   appellate review, orders granting class certification receive "noticeably more deference" from the

21   Ninth Circuit than orders denying certification.  *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952,

22   956 (9th Cir. 2013).  As set forth below, Plaintiffs satisfy each of the requirements for certification

23   under Rules 23(a) and 23(b)(3).

### A.     The Requirements Of Rule 23(a) Are Satisfied

#### 1.     <u>Numerosity</u>

26          "Under the numerosity requirement, a class must be 'so numerous that joinder of all members

27   is impracticable.'"  *Wasatch*, 327 F.R.D. at 409 (quoting Fed. R. Civ. P. 23(a)(1)).  "The numerosity

28   requirement is not tied to any fixed numerical threshold – 'it requires examination of the specific

facts of each case and imposes no absolute limitations.'" *Kaupelis*, 2020 WL 5901116, at *7 (quoting *Rannis v. Recchia*, 380 Fed. App'x 646, 651 (9th Cir. 2010)). "In general, courts find the numerosity requirement satisfied when a class includes at least 40 members." *Id.* "Courts do not require plaintiffs 'to fix a precise number.'" *Id.* (quoting *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 680 (S.D. Cal. 1999)). "Instead, '[t]he central question is whether [p]laintiffs have sufficiently identified and demonstrated the existence of the numbers of persons for whom they speak.'" *Id.* (quoting *Schwartz*, 183 F.R.D. at 680-681). This requirement is readily established considering that Defendant sold approximately 757,020 units of the Dehumidifiers nationwide. *See* Ex. 2 at 5. Accordingly, this proposed class satisfies the numerosity requirement under Rule 23(a).

### 2.    **Commonality**

"Under Rule 23(a)(2), commonality is established if 'there are questions of law or fact common to the class.'" *Orozco v. Illinois Tool Works, Inc.*, 2017 WL 1356020, at *2 (E.D. Cal. Feb. 17, 2017) (quoting Fed. R. Civ. P. 23(a)(2)). "This requirement is construed permissively" and "[e]ven a single common question that meets this criteri[on] satisfies Rule 23(a)(2)." *Id.* (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) and *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 342 (2011)).

In *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010), another product defect case, the Ninth Circuit held that commonality was "easily" satisfied by common questions such as whether there was a defect and whether the defendant knew about the defect. *See also Alger v. FCA US, LLC*, 334 F.R.D. 415, 423 (E.D. Cal. 2020) (following *Wolin*). Questions of "whether the defendant had a duty to disclose the . . . defects" or whether the "defects would be material to a reasonable consumer" also support the commonality requirement. *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334 (N.D. Cal. Aug. 10, 2018) (citing *Wolin*).

Likewise, here, common questions include whether there was an F0 Defect; whether Electrolux Home Products knew about the F0 Defect; whether the F0 Defect was material to reasonable consumers; whether Electrolux Home Products breached an implied warranty; and what is the proper measure of damages. *See Kaupelis*, 2020 WL 5901116, at *7 (determining that nearly-

identical issues support commonality); *see also Schmitt v. Younique, LLC*, 2019 WL 1431906 at *4 (C.D. Cal. Jan. 10, 2019) (same).

### 3.   Typicality

In accordance with Rule 23(a)(3), "the 'claims or defenses of the representative parties must be typical of the claims or defenses of the class.'" *Wasatch*, 327 F.R.D. at 410 (quoting Fed. R. Civ. P. 23(a)(3) (brackets omitted)). "Typicality is satisfied if the representative's claims arise from the same course of conduct as the class claims and are based on the same legal theory." *Aldapa v. Fowler Packing Co., Inc.*, 323 F.R.D. 316, 327 (E.D. Cal. 2018) (citing *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995)). "'The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Id.* (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "Under Rule 23(a)'s permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Cruz v. MM 879, Inc.*, 329 F.R.D. 639, 646 (E.D. Cal. 2019) (quoting *Hanon*, 150 F.3d at 1020).

Here, Plaintiff's claims are typical of the class because he purchased the same Dehumidifiers as the class, and his claims are not based on any conduct by Defendant that is unique to him. Plaintiff also seeks to recover damages under the same legal theories as the class. If his claims are successful, he "would be entitled to the same remedies as the absent class members: damages . . . or restitution." *Galvan v. KDI Distrib. Inc.*, 2011 WL 5116585 at *7 (C.D. Cal. Oct. 25, 2011). Hence, the typicality requirement is satisfied.

### 4.   Adequacy

#### a.   *Plaintiff Is An Adequate Representative*

"Class representatives must be able to 'fairly and adequately protect the interests of the class.'" *Wasatch*, 327 F.R.D. at 412 (quoting Fed. R. Civ. P. 23(a)(4)). "'This requirement is grounded in constitutional due process concerns: absent class members must be afforded adequate representation before entry of a judgment which binds them.'" *Kaupelis*, 2020 WL 5901116, at *9 (quoting *Evans v. IAC/Interactive Corp.*, 244 F.R.D. 568, 577 (C.D. Cal. 2007)). "'Resolution of

two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Wasatch*, 327 F.R.D. at 412 (quoting *Hanlon*, 150 F.3d at 1020).

Plaintiff has no conflicts of interest with absent class members.  Plaintiff has participated in this litigation, responded to written discovery and expects to further assist in this case as needed, including sitting for his deposition. *See Wasatch*, 327 F.R.D. at 412; *Schmitt*, 2019 WL 1431906 at *6.

### b.   *Plaintiff's Counsel Is Adequate*

When evaluating the adequacy of counsel, relevant factors include counsel's work in prosecuting the claims; counsel's knowledge and experience with class actions and the applicable law; and counsel's resources. *See* Fed. R. Civ. P. 23(g)(1)(A).  Bursor & Fisher has worked tirelessly pursuing this action, demonstrated professionalism and knowledge of the law, and has a strong record of litigating class actions through jury trials and appeal. *See Guinn v. Sugar Transp. Of the Nw., Inc.*, 2017 WL 6513306, at *6 (E.D. Cal. Dec. 20, 2017) ("Although there are no fixed standards by which 'vigor' can be assayed, considerations include competency of counsel.") (quoting *Hanon*, 150 F.3d at 1021).  The firm's resume is attached to the Fisher Declaration as Exhibit 9.  Numerous other courts have held that the attorneys at Bursor & Fisher "are experienced and qualified class action lawyers.  Bursor & Fisher, P.A., has been appointed class counsel in dozens of cases in both federal and state courts, and has won several multi-million-dollar verdicts or recoveries." *Famular v. Whirpool Corp.*, 2019 WL 1254882, at *4 (S.D.N.Y. Mar. 19, 2019); *see also Melgar v. Zicam, LLC*, 2014 WL 5486676, at *2 (E.D. Cal. Oct. 29, 2014) ("Bursor & Fisher is a well-established, reputable firm that is up to handling challenges of this litigation and is capable of committing the requisite resources to doing so."); *Kaupelis*, 2020 WL 5901116, at *10 ("The above analysis, together with HFT's failure to respond to Plaintiffs' argument that Bursor & Fisher are adequate class counsel … lead the Court to conclude that adequacy has been met.").

### B.   Common Questions Of Law Or Fact Predominate

Under Rule 23(b)(3), certification is proper if "questions of law or fact common to class

members predominate over any questions affecting only individual members." *Schmitt*, 2019 WL 1431906 at *7.  "To determine whether common issues predominate, this Court must first examine the substantive issues raised by [the plaintiff] and second inquire into the proof relevant to each issue."  *Id.*  Plaintiff is not, however, required to prove his case at certification.  He need only show that "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication."  *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018).

As a preliminary matter, Defendant may argue that relatively few people experienced the Defect (though the evidence is to the contrary), and that there are individual issues about whether and under what circumstances people experienced the F0 Defect.  However, "[p]roof of the manifestation of a defect is not a prerequisite to class certification."  *Wolin*, 617 F.3d at 1173-74.  The Ninth Circuit has reaffirmed this rule on three occasions, including in a 2015 decision where the defendant unsuccessfully argued that the defect "[did] not manifest in the vast majority" of products.  *Baker v. Microsoft Corp.*, 797 F. 3d 607, 610-611 (9th Cir. 2015) *rev'd and remanded on other grounds*, 137 S. Ct. 1702 (2017); *see also Edwards v. Ford Motor Co.*, 603 Fed. Appx. 538, 540-41 (9th Cir. 2015) (determining that the lower court erred by holding the existence of a defect presented individualized issues defeating the predominance requirement); *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 820 (9th Cir. 2019) (reaffirming *Wolin*).

As set forth below, Plaintiffs can prove their claims with common proof.

### 1.   Claims Under the CLRA and UCL Fraud Prong

"Under California law, class members in CLRA and UCL actions are not required to prove their individual reliance on the allegedly misleading statements.  Instead, the standard in actions under both the CLRA and UCL is whether members of the public are likely to be deceived." *Bradach v. Pharmavite, LLC*, 735 F. App'x 251, 254 (9th Cir. 2018) (internal quotation omitted).  "For this reason, courts have explained that CLRA and UCL claims are 'ideal for class certification because they will not require the court to investigate class members' individual interaction with the product.'" *Id.* (quoting *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012)).

"Each statute allows plaintiffs to establish materiality and reliance (*i.e.*, causation and injury) by showing that a reasonable person would have considered the defendant's representation material." *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 983 (C.D. Cal. 2015), *aff'd sub nom.  Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017).  "UCL [and] CLRA . . . claims that rely on a theory of fraudulent omission are also susceptible to class wide proof because under California law, reliance can be inferred when an omission is material, and whether an omission is material is determined using a 'reasonable consumer' standard."  *In re Arris*, 327 F.R.D. at 365; *see also Salas v. Toyota Motor Sales, U.S.A., Inc.*, 2019 WL 1940619 at *9-10 (C.D. Cal. Mar. 27, 2019) (certifying UCL and CLRA claims where plaintiffs alleged defendant failed to disclose a defect); *Tait*, 289 F.R.D. at 482 (same).

In other words, "a fact is material if, had the alleged defect been disclosed, the reasonable consumer 'would have been aware of it and behaved differently.'" *Corson v. Toyota Motor Sales, U.S.A., Inc.*, 2013 WL 10068136, at *5 (C.D. Cal. July 18, 2013) (quoting *Keegan v. American Honda Motor Co.*, 838 F. Supp. 2d 929, 940 (C.D. Cal. 2012)); *see also Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) ("An omission is material if a reasonable consumer 'would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.'").

Here, there is no legitimate dispute that members of the class relied on Defendant's packaging in making their decisions to purchase the Dehumidifiers and had there been a disclosure of the F0 Defect, Plaintiff and the class members would not have purchased the Dehumidifiers or, at the very least, would have purchased the product at a substantially reduced price.  *See* Obertman Decl. ¶ 6; *see also* FAC ¶ 119.

## 2.   The Implied Warranty Claim

Plaintiff seeks to certify a Multi-State Implied Warranty Class consisting of class members from the 23 states set out in Section I above.  Certification of this multi-state class is appropriate as there are no material differences amongst the implied warranty statutes in these states and the requirements set forth in the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1791.1. Accordingly, certification of this class is consistent with the due process rule that "[t]here can be no

injury in applying [state] law if it is not in conflict with that of any other jurisdiction connected to this suit." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985). Likewise, certification is permissible under the first prong of California's governmental interest test, which turns on "whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different." *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 88 (2010).

To assist in this analysis, Plaintiff has attached a Multi-State Implied Warranty Survey setting out the material elements for proving a claim in these states. *See* Ex. 13. Plaintiff seeks certification of a narrow grouping of states, selecting only those states that have implied warranty laws that are substantially similar to the Song-Beverly Act's implied warranty provisions. That is, Plaintiff has chosen only those states meeting the following criteria. First, only states that adopted the provisions in U.C.C. § 2-314 for implied warranty without material modification are included. As such, each jurisdiction provides that the implied warranty of merchantability is breached if the product at issue is not "fit for the ordinary purpose for which such goods are used." *See*, *e.g.*, Ex. 13. Second, only states that do not require privity have been included. *See id.* Finally, any differences in the various states' statute of limitations have been accounted for.[4] *See id*.

That analysis leaves 23 states with nearly identical implied warranty regimes. Other courts have certified multi-state implied warranty classes involving more states and entailing a number of differences between the statutes. *See, e.g., Kaupelis*, 2020 WL 590116, at *2, *15 (certifying an implied warranty class consisting of the following 24 states: Alaska, Arkansas, California, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, Utah, Virginia, Wyoming). Moreover, California courts have recognized that aside from privity – which is of no concern here for the reasons discussed above – "there is facially no conflict" between the Song-Beverly Act and California's incorporation of the U.C.C.'s implied

---

[4] *See Kaupelis*, 2020 WL 5901116, at *13. ("The only state that Plaintiffs note has a statute of limitations that runs for less than four years is Colorado . . . Colorado's statute of limitations bars claims after three years. Colo. Rev. Stat. § 4-2-725. But, the Multi-State Implied Warranty Class specifically limits members of the class to those from Colorado who purchased their chainsaw within three years of the filing of this lawsuit . . . Therefore, Colorado's interests would not be impaired.").

warranty of merchantability.  *See California State Elecs. Assn v. Zeos Internat, Ltd.*, 41 Cal. App. 4th 1270, 1276 (1996) (internal citations omitted).  Accordingly, since California's Song-Beverly Act is substantially similar to the UCC's implied warranty provisions, the Song-Beverly Act's implied warranty provisions are substantially similar to the implied warranty provisions of the other states included here.  Certification of the Multi-State Implied Warranty Class is therefore appropriate.

### 3.    **The Unjust Enrichment Claim**

Courts certify unjust enrichment claims that are based on a failure to disclose a product defect because the elements are generally susceptible to classwide proof.  "In California, the elements of an unjust enrichment claim are the receipt of a benefit and the unjust retention of the benefit at the expense of another."  *Salas*, 2019 WL 1940619, at *11.  "Class certification of unjust enrichment claims is appropriate when, as here, 'the crux of plaintiffs' claims is that the defendant unjustly retained the benefits of its sale of . . . products to consumers after it failed to disclose material facts about the defective nature of those products."  *In re Scotts EZ Seed Litig.*, F.R.D. 397, 412 (S.D.N.Y.) (applying California law and quoting *Cartwright v. Viking Indus., Inc.*, 2009 WL 2982887, at *13 (E.D. Cal. Sept. 14, 2009)); *see also Salas*, 2019 WL 1940619, at *11 ("the court finds that class certification is appropriate with respect to this [unjust enrichment] claim since it is based on the same common evidence regarding Toyota's failure to disclose the HVAC Defect.").

Electrolux knew about the F0 Defect as early as 2015.  *See* Section II(B) above.  Beginning in 2015, consumers voiced their frustrations with the F0 Defect directly to Electrolux and on various retailers' websites.  Electrolux monitored and responded to those complaints.  Electrolux's CEC also received **over 21,000** complaints about the F0 Defect, starting in 2015.  In 2016, Defendant's CEC employees underwent training on how to handle calls related to the F0 Defect.  *See* Ex. 1 at 2-3, 26-28.  Electrolux was also contacted by Big Apple Industries in 2017, alerting Mr. Besant to the presence of the F0 Defect.  Ex. 1 at 41-42.  Mr. Besant launched a "quality project" shortly afterwards and determined that "there were refrigerant leaks in [all five of] the samples" that Big Apple Industries had provided.  Ex. 1 at 44.  Finally, numerous emails to and from Electrolux employees demonstrate that Electrolux was aware of the higher number of complaints as compared to similar dehumidifier models that it distributes.  Ex. 4 at 1-2.  At no point, however, did Electrolux reveal

this information to consumers or take any remedial action.  Instead, Electrolux continued to sell the Dehumidifiers with knowledge of the F0 Defect at its customers' expense.  Accordingly, Plaintiff respectfully requests that this Court certify the unjust enrichment class.

### C.   Other Certification Requirements Are Satisfied

#### 1.   Class Litigation Is Superior To Other Methods Of Adjudication

In addition to predominance, Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Relevant factors include:

> (A) the class members' interest in prosecuting their actions individually; (B) the extent and nature of pre-existing litigation by class members concerning the controversy; (C) the desirability of concentrating the litigation in this particular forum; and (D) the difficulties in managing the class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

Those factors support certification here.  The Dehumidifiers cost roughly $200-400, leaving no incentive for individual claims.  *See* FAC ¶ 14 (setting out pricing); *see also Wolin*, 617 F.3d at 1175 ("certification warranted where individual recoveries 'would be dwarfed by the cost of litigating on an individual basis").  It also is more efficient to resolve common issues concerning, for example, the cause of the F0 Defect in the Dehumidifiers rather than having individual courts resolve these issues separately.  *See  Wolin*, 617 F.3d at 1175 ("Forcing individual vehicle owners to litigate their cases, particularly where common issues predominate for the proposed class, is an inferior method of adjudication.").

#### 2.   Plaintiff Presents A Viable Damages Model

The predominance requirement requires Plaintiff to "present a damages model that demonstrates that damages can be reliably calculated on a class-wide basis."  *Schmitt*, 2019 WL 1431906, at *8.  "At the class certification stage, 'Plaintiffs need only show that such damages can be determined without excessive difficulty and attributed to their theory of liability.'"  *Id.* (quoting *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1121 (9th Cir. 2017)).

If Plaintiff prevails on liability, he will be entitled to damages (under the CLRA and implied warranty claims) and restitution (under the UCL, CLRA, and unjust enrichment claims).  *See* Cal.

Civ. Code §§ 1780, 1791.1(d), 1794(b)(2); Cal. Bus. & Prof. Code § 17203.  Under either remedy, class members' recovery would be calculated by subtracting the actual value of the product at the time of purchase from the price paid.  *See Pulaksi & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015).  "The calculation need not account for benefits received after purchase because the focus is on the value of the service at the time of purchase."  *Id.*

"District courts have recognized conjoint analysis as 'a generally accepted method for valuing the individual characteristics of a product,' and have certified classes where plaintiffs used conjoint analysis."  *Martinelli v. Johnson & Johnson*, 2019 WL 1429653, at *4 (E.D. Cal. Mar. 29, 2019) (citing *Odyssey Wireless, Inc. v. Apple, Inc.*, 2016 WL 7644790, at *2 (S.D. Cal. Sept. 14, 2016), and *In re Lenovo Adware Litig.*, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016)); *see also Kaupelis*, 2020 WL 5901116, at *6 ("Conjoint analysis has been used for decades as a way of estimating the market's willing[n]ess to pay for various product features." (internal quotations omitted); *In re Arris*, 327 F.R.D. at 370 ("conjoint analysis is a well-accepted economic methodology"); *Guido v. L'Oreal, USA, Inc.*, 2014 WL 6603730, at *8 (C.D. Cal. July 24, 2014) (explaining that conjoint analysis "has been used for decades" and that "several district courts" have held the method to be admissible and reliable).  The damages model developed by Plaintiff's experts Gaskin and Weir is described more fully in Section II(D) above, and in their concurrently-filed declarations.  *See* Ex. 10 at 5-11; Ex. 11 at 4-9.

### 3.  Ascertainability Is No Longer Required, But In Any Event, The Classes Are Ascertainable

Some courts have held that "ascertainability" is an implied requirement for certification.  *See*, *e.g.*, *Galvan v. KDI Distribution, Inc.*, 2011 WL 5116585, at *3 (C.D. Cal. Oct. 25, 2011).  In a series of later decisions, however, the Ninth Circuit held that there is no such requirement and that it is reversible error to deny certification on that basis.  *See True Health*, 896 F.3d at 929 ("there is no free-standing requirement above and beyond the requirements specifically articulated in Rule 23"); *Burton v. Gerber Prod. Co.*, 703 F. App'x 468, 470 (9th Cir. 2017) ("The district court erred when it held that the class could not be certified because it was not 'ascertainable.'"); *accord Briseno*, 844 F.3d at 1126.

Nonetheless, even if ascertainability remains a requirement, it is satisfied here because the class definition includes an objective way to ascertain membership: a person is a class member if he or she bought one or more of the Dehumidifiers during the class period.  That simple definition allows class members to self-identify themselves.  *See Jacobo v. Ross Stores, Inc.*, 2017 WL 9486150, at *5 (C.D. Cal. May 1, 2017) ("the proposed class is administratively feasible because class members can self-identify."); *see also Otto v. Abbott Lab'ys Inc.*, 2015 WL 9698992, at *2 (C.D. Cal. Sept. 29, 2015) ("a class is usually ascertainable because putative class members can self-identify based on whether they purchased the product – a simple, objective criterion for identifying class membership.").

## IV.   CONCLUSION

For the reasons stated above, Plaintiff respectfully asks this Court to certify the classes described herein, appoint him as class representative, and appoint Bursor & Fisher as class counsel.

Dated:  June 15, 2021

**BURSOR & FISHER, P.A**.

By:   ___/s/ *L. Timothy Fisher*_____
        L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
1990 North California Blvd., Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
        jsmith@bursor.com

**BURSOR & FISHER, P.A.**
Alec M. Leslie (*pro hac vice*)
888 7th Avenue
New York, NY  10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: aleslie@bursor.com

*Attorneys for Plaintiff*